IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| TIMEIL SEALS AND KRISTEN FREEMAN, | § § § § | MDL NO. 2543<br>1:14-MD-2543-JMF |
| *Plaintiffs*, | § § | HON. JESSE M. FURMAN |
| v. | § § | CIVIL ACTION NO. _____ |
| GENERAL MOTORS, LLC, | § § | AMENDED COMPLAINT |
| *Defendant.* | § § | JURY TRIAL DEMANDED |

**PLAINTIFFS' FIRST AMENDED ORIGINAL COMPLAINT**

COME NOW Plaintiff, TIMEIL SEALS ("Plaintiff Seals") and Plaintiff KRISTEN FREEMAN ("Plaintiff Freeman") (hereinafter the "Plaintiffs"), through the undersigned counsel, are hereby amending their Original Complaints. Plaintiff Seals' lawsuit was filed in a multiple-plaintiff complaint, ***Brown, et al. v. General Motors, Case No. 1:16-cv-05947***, on June 29, 2016 and transferred to the United Stated District Court for the Southern District of New York on July 18, 2016 (*see* MDL Docket No. 3128). Plaintiff Freeman's lawsuit was filed in a multiple-plaintiff complaint, ***O'Quinn, et al. v. General Motors, Case No. 1:16-cv-08229***, on September 15, 2016 and transferred to the United Stated District Court for the Southern District of New York on September 30, 2016 (*see* MDL Docket No. 3424). Plaintiffs respectfully shows as follows:

**I.**
**INTRODUCTION**

1.      This action arises out of a motor vehicle incident that occurred on April 10, 2010 (the "Subject Incident"). On that date, Plaintiff Seals was driving, with Plaintiff Freeman accompanying her in the front passenger seat of a 1997 Chevrolet Malibu (VIN No. 1G1ND52MXV6145695 (the "Subject Vehicle")), on a city street in Little Rock, Arkansas. Upon

1

accelerating from a stoplight, Plaintiff Seals suddenly lost the ability to control the vehicle and then struck several fixed objects, including a tree, whereupon it flipped over onto its side. Despite the severity of the frontal impacts, the airbags did not deploy during the crash sequence.

2.    Prior to the Subject Incident, Defendant General Motors LLC ("New GM" or "Defendant") knew that Plaintiff Seals' 1997 Chevrolet Malibu was defective; specifically, the Subject Vehicle contains an ignition switch which is prone to slipping into the "accessory" or "off" position without warning while the car is in motion, which turns off the engine and the car's vital engine systems.  When this occurs, the vehicle's power steering and power braking systems are lost, and in the event of a crash, the airbags will not deploy when they should. Such disastrous system failures can be triggered by something as simple as a key chain attached to the vehicle's key or a bump in the road, which can lead to the vehicle's ignition switch to changing from the "run" position into the "accessory/off" position, with a corresponding loss of engine power, loss of power-steering, loss of power-brakes, and loss of airbag functionality.  (*See* Jul. 3, 2014 Ltr. from New GM to Nancy Lewis re: National Highway Transportation Safety Administration ("NHTSA") Recall No. 14V-400 ("Lewis Letter") at 1 ("Until the recall repairs have been performed, it is very important that customers remove all items from their key rings, leaving only the vehicle key."); *see also* Sept. 2014 Owner Notification Ltr. regarding NHTSA Recall No. 14V-400 at 1 ("If the key ring is carrying added weight and the vehicle goes off road or experiences some other jarring event, it may unintentionally move the key away from the 'run' position.").) Yet, New GM also admits to its customers that lightening the key chain may not totally help, as "rough road conditions or other jarring impact related events" *alone* could cause the vehicle to experience inadvertent switch rotation, followed by full loss of power, power-steering, power-braking, and airbag functionality.

3.      New GM knew about the Ignition Switch Defect ("ISD") from its inception, yet failed to adequately disclose the ISD or warn users of said defect. Rather, Defendant negligently, intentionally, purposely, fraudulently, and systematically concealed serious safety defects from Plaintiffs, the federal government, and the public at large.

4.      Accordingly, Plaintiffs bring this damages action against New GM asserting claims for negligence, fraudulent concealment, consumer fraud, strict products liability, and punitive damages under Arkansas law.

## II.
## PARTIES

5.      Plaintiff Seals is a resident of Mabelvale, Arkansas. At the time of the accident, Plaintiff Seals was a resident of Little Rock, Arkansas.

6.      Plaintiff Freeman is, and was at all times relevant hereto, a resident of Little Rock, Arkansas.

7.      The Plaintiffs assert claims against Defendant General Motors LLC ("New GM") for personal injuries stemming from an incident which occurred on April 10, 2010 involving a 1997 Chevrolet Malibu.

8.      Defendant New GM is a citizen of Delaware and Michigan, and does business in all fifty U.S. states, including Arkansas.  General Motors LLC's principal place of business is in Detroit, Michigan.

9.      General Motors Corporation ("Old GM") was a Delaware corporation with its headquarters in Detroit, Michigan.  Prior to July 10, 2009, Old GM, through its various entities, designed, manufactured, marketed, distributed, and sold Chevrolet, Pontiac, Saturn, and other "GM" brand automobiles, including Plaintiff Seals' 1997 Chevrolet Malibu, in all fifty U.S. states and indeed worldwide.

10.    In June of 2009, Old GM filed for bankruptcy.  On July 9, 2009, the United States Bankruptcy Court approved the sale of substantially all of Old GM's assets pursuant to a Master Sales and Purchase Agreement ("Agreement").  The Agreement became effective on July 10, 2009.  The Agreement approved the sale of Old GM's assets to Defendant New GM.

11.    The Agreement defines Defendant's "Purchased Assets" as:

> (xiv) all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials (in whatever form or medium), including Tax books and records and Tax Returns used or held for use in connection with the ownership or operation of the Purchased Assets or Assumed Liabilities, including the Purchased Contracts, customer lists, customer information and account records, computer files, data processing records, employment and personnel records, advertising and marketing data and records, credit records, records relating to suppliers, legal records and information and other data;

> (xv)    all goodwill and other intangible personal property arising in connection with the ownership, license, use or operation of the Purchased Assets or Assumed Liabilities; . . . .

AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT at Section 2.2.

12.    Along with the Purchased Assets, New GM also expressly took on a range of liabilities.  "Liabilities" is defined in the Agreement as "any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including Indebtedness and those arising under any Law, Claim, Order, Contract or otherwise."

13.    Among many others, the Liabilities assumed by New GM under the Agreement include:

> (vii) (A) all Liabilities arising under express written warranties of Sellers [i.e., old GM] that are specifically identified as warranties

4

and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser [i.e., new GM] prior to or after the Closing and (B) all obligations under Lemon Laws; . . .

(ix) all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers (collectively, "Product Liabilities"), which arise directly out of accidents, incidents, or other distinct and discreet occurrences that happen on or after the Closing Date and arise from such motor vehicles' operation or performance; . . .[1]

(xi) all Liabilities arising out of, relating to, in respect of, or in connection with the use, ownership or sale of the Purchased Assets after the Closing; . . .

14.     New GM also undertook responsibility for compliance with a wide range of laws and other regulations, including:

(a)     From and after the Closing, Purchaser [Defendant New GM] shall comply with the certification, reporting, and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller [Old GM].

(b)     From and after the Closing, Purchaser [Defendant New GM] shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [Old GM] . . . (ii) Lemon Laws.

15.     Pursuant to the Agreement and other orders of the Bankruptcy Court, Defendant New GM purchased the assets of Old GM and hired many, if not most, of Old GM's employees

---

[1] Pursuant to an order of the bankruptcy court, this particular category of Assumed Liabilities is "regardless of when the product was purchased."

including, on information and belief, most of the same senior-level management, officers, and directors, many of whom carried over knowledge of the Ignition Switch Defect in their continued employment capacity at New GM.

16.     This Complaint does not assert any causes of action against Old GM.  All causes of action and attributions of liability are directed solely against Defendant New GM. Allegations pertaining to Old GM are included herein because (a) with respect to claims involving personal injury, death, and property damage, among certain other claims, in Old GM manufactured vehicles, New GM expressly assumed liability for certain conduct and liabilities of Old GM; and (b) New GM also acquired knowledge of Old GM's activities and the common defects in many GM-brand vehicles, including the serious safety defects identified herein, via the mind of the employees, officers, managers, books, and records obtained and/or acquired as a result of the Purchase Agreement and subsequent Sale Order, as further defined by the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in *Motors Liquidation Company, et al., f/k/a General Motors Corp., et al.*, Case No. 09-50026 (REG).  Thus, the conduct, knowledge and duties of Old GM are part of the foundation for the liabilities assumed by New GM, as Plaintiffs base their claims on a crash involving an Old GM vehicle which, due to Old GM's and New GM's wrongful, negligent actions and inactions, caused Plaintiffs personal injury and property damage and New GM is, therefore, liable to Plaintiffs.

17.     At all times relevant to the claims in this lawsuit, Old GM and New GM were in the business of developing, manufacturing, and marketing cars throughout the United States generally, and specifically in the Plaintiffs' state of citizenship.  New GM has a network of authorized retailers that sell its vehicles and parts throughout the United States.

### III.
### JURISDICTION

18.     This Court has diversity jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000.00 and the Plaintiffs and New GM are citizens of different states.

### IV.
### FACTUAL BACKGROUND

**A.     The April 10, 2010 Incident**

19.     On April 10, 2010, Plaintiff Seals was driving a 1997 Chevrolet Malibu (VIN No. 1G1ND52MXV6145695) on a city street in Little Rock, Arkansas, with Plaintiff Freeman accompanying her in the front passenger seat.  At or around the time Plaintiff Seals accelerated from a traffic stoplight, Plaintiff Seals suddenly lost the ability to control the vehicle.  Plaintiff Seals applied the brakes but they were not responsive, and in spite of both the driver *and* the passenger using their best efforts to turn the steering wheel and maneuver the vehicle back onto the roadway, the Subject Vehicle continued off the road, striking a utility pole, an iron fence, and a tree, and then flipping over onto its side.

20.     Despite the severe crash impacts during the accident sequence, the airbags did not deploy.[2]

---

[2] Plaintiffs understand that certain accident scene photographs appear to show deployed frontal airbags in the Subject Vehicle; however, these photographs were ostensibly taken after the Subject Incident, and Plaintiff Freeman specifically recalls crawling over Plaintiff Seals in the driver's seat to get out of the vehicle post-crash and no airbags had deployed at that time. Indeed, members of the automotive industry (including New GM) acknowledge that vehicle airbag systems can sometimes maintain energy after the engine has shut down, and late deployment may occur so long as the airbag system still has energy.  This is why emergency responders are trained to disconnect the vehicle battery prior to extricating someone from a crashed vehicle, so that the airbag's power source can fully drain and the responder is not at risk of injury from late airbag deployment. *See, e.g.*, General Motors Service Technical College, "First Responder Guide: Airbags and Pretensioners," Apr. 2013, available at https://www.gmstc.com/WebTreeDocuments/download.asp?lID=9&nID=683 (last visited May 7, 2018), at 14 ("In the event of an emergency rescue with an undeployed airbag, disconnect the negative battery cable first and then disconnect the positive battery cable to remove power to the airbag system. . . . Anyone who is up against or very close to any airbag when it inflates could be seriously injured or killed."); *see also* Thomas J. Shepich, "Safety Airbag

21.     Upon striking the tree and flipping over, Plaintiff Freeman's head struck the front windshield and shattered the glass, causing glass to become embedded in her head.  After the vehicle came to a rest on its right side, Plaintiff Freeman saw that Plaintiff Seals was unconscious in the driver's seat, and no airbags had deployed.  Plaintiff Freeman was able to crawl over Plaintiff Seals in the driver's seat to get out of the vehicle, and she then knocked on the doors of several nearby residences in order to seek assistance.  Eventually, a homeowner opened the door and they called 911. Emergency responders arrived to the scene some time thereafter.

22.     Plaintiff Seals suffered pneumothorax in both lungs, had breaks in her T-5 to T-11 vertebrae, and ultimately became paraplegic.  Plaintiff Freeman suffered a fracture of the fifth metatarsal and contusions to her head and scalp.

23.     Upon information and belief, this tragic incident occurred due to the Subject Vehicle's defective ignition switch system.  Specifically, the Subject Vehicle suddenly and without warning lost engine power, causing the power steering and power braking systems to shut down and rendering the airbags dysfunctional, due to unintended ignition switch rotation caused by the Subject Vehicle's defective ignition switch system.

**B.     Old GM and New GM Concealed a Known Defect in Plaintiff's and Other Vehicles**

    a.     *The Defective Vehicles*

24.     The Plaintiffs' personal injury claims involve a Defective Vehicle, specifically a 1997 Chevrolet Malibu (VIN 1G1ND52MXV6145695).  As used in this Complaint, the "Defective Vehicles" refers to the following vehicles sold in the United States, which were equipped at the

---

Bulletin on Automobile Air Bag Safety," Occupational Safety and Health Administration (OSHA), Aug. 30, 1990, available at https://www.osha.gov/dts/hib/hib_data/hib19900830.html (last accessed May 7, 2018). Upon information and belief, some such "late deployment" must have occurred after Plaintiffs' crash sequence, as the airbags had not deployed by the end of said sequence.

time of sale with an ignition switch system sharing a common defective design:

- 2005-2009 Buick Lacrosse;

- 2006-2011 Buick Lucerne;

- 2003-2014 Cadillac CTS;

- 2000-2005 Cadillac Deville;

- 2006-2011 Cadillac DTS;

- 2004-2006 Cadillac SRX;

- 2010-2014 Chevrolet Camaro;

- 2011-2013 Chevrolet Caprice;

- 2005-2010 Chevrolet Cobalt;

- 2006-2011 Chevrolet HHR;

- 2000-2014 Chevrolet Impala;

- 1997-2005 Chevrolet Malibu Classic;

- 2000-2007 Chevrolet Monte Carlo;

- 1999-2004 Oldsmobile Alero;

- 1998-2002 Oldsmobile Intrigue;

- 2005-2010 Pontiac G5;

- 2008-2009 Pontiac G8;

- 1999-2005 Pontiac Grand Am;

- 2004-2008 Pontiac Grand Prix;

- 2006-2010 Pontiac Solstice;

- 2003-2007 Saturn Ion; and

- 2007-2010 Saturn Sky.

25.    The Subject Vehicle falls within that group of Defective Vehicles.

26.    The ignition switches in the Defective Vehicles contain several common switch points, including "run" (or "on"), "off," and "accessory."  At the "run" position, the vehicle's motor engine is running and electrical systems have been activated; at the "accessory" position the motor is off, and electrical power is generally only supplied to the vehicle's entertainment system; and at the "off" position, both the vehicle's engine and electrical systems are turned off.  In most vehicles, a driver must intentionally and manually turn the key in the ignition to move to these various positions.

27.    In the Defective Vehicles, the ignition switch may suddenly and without warning move from the "run" to the "accessory" or "off" position while the vehicle is in motion. New GM has attributed this to a number of catalysts, including a detent plunger in the ignition switch which does not generate sufficient torque to keep key in its proper position while the vehicle is in motion. Put simply, the ignition switch fails to stay in the "run" position when it is supposed to stay in the "run" position.

28.    In addition, the Defective Vehicles contain an ignition cylinder, with the key position of the lock module on the steering column and an ignition key with a slot for a key ring at the top.  By design, the ignition switch was placed low on the steering column, making it easy for a driver of regular height to inadvertently impact the ignition switch with his or her knee while operating the vehicle.  Such an impact may jar the ignition switch and cause it to move from the "run" to the "accessory" or "off" position.

29.    The ignition switch in the Defective Vehicles is prone to fail during ordinary and foreseeable driving situations (such as traveling across bumpy or uneven roadways or when the vehicle experiences extreme jarring movements).  When the ignition switch "fails," and the

ignition switch moves from the "run" to the "accessory" or "off" position during ordinary operation of the vehicle, the power to the vehicle is terminated (even at highway speeds), and the vehicle loses power steering and power brakes, which suddenly and without warning makes the vehicle difficult to control.

30.    Each of the Defective Vehicles also contains an airbag system that is disabled when the ignition switch on the vehicles fails during ordinary and foreseeable driving situations.  Thus, as a result of the defective design of the Defective Vehicles, a driver whose ignition switch fails may suddenly and without warning experience a vehicular power failure that also disables the vehicle's airbags, and power steering and brakes.  Such a failure may occur unexpectedly and during normal operation of the vehicle.

31.    The ignition switch systems at issue are defective in at least three major respects. First, the switches are simply weak; the torque, i.e., force, required to move the switches out of "run" and into the "accessory" position is too low, which causes inadvertent switch rotation. Second, because the ignition switches are placed low on the steering column, a driver's knee can easily bump the key (or the hanging keychain attachments) and cause the switches to inadvertently move from the "run" to the "accessory" or "off" position.  Third, when the ignition switches move from the "run" to the "accessory" or "off" position, vehicles lose power, disabling critical safety systems such as power brakes, power steering, and airbags even if the vehicles are traveling at high speeds.  This single point of failure is particularly dangerous given the susceptibility of the switch to inadvertent rotation due to, among other things, low torque, knee-key events, the use of a slotted head key design and/or heavy keys, and switch location.

32.     Both Old GM and Defendant New GM recognized that the defect was not limited to simply a low torque issue. Old-to-New GM employees,[3] while in their employment capacity at New GM, were aware of safer alternative designs, but chose not to employ them due to cost and to avoid disclosure of the defective ignition switch and its tragic consequences.   And while Defendant New GM has recalled millions of vehicles for defective ignition switches, it knew – and its own engineering documents reflect – that the defect transcends the low torque switch that was originally installed in vehicles subject to ignition switch defect-related NHTSA recalls.   Thus, Defendant New GM's recall of the Defective Vehicles has been, to date, incomplete and inadequate, and it underscores Defendant New GM's ongoing fraudulent concealment and misrepresentation of the nature and extent of the defects.   Defendant New GM has long known of and understood the ignition switch defect and failed to fully remedy the problems associated with this defect.

33.     Plaintiff Seals' 1997 Chevrolet Malibu contained the defective ignition switch and airbag system described in this Amended Complaint.   The ignition switch defect precludes drivers and occupants of the Defective Vehicles, such as these Plaintiffs, from proper and safe use of their vehicles, reduces vehicle occupant protection, and endangers Subject Vehicle occupants as well as those in vehicles around them. Further, because Old GM and Defendant New GM concealed the existence of the ignition switch defect as defined herein, no driver or owner of the Defective Vehicles, including Plaintiffs, knew, or could reasonably have discovered, the ignition switch defect.

---

[3] As used herein, the term "Old-to-New GM employees" refers to employees who were employed by Old GM and continued in their same employment capacity (i.e., performed the same job-related tasks, held the same responsibilities, and/or continued their employment in general) as employees at New GM.

34.    Indeed, despite knowing about this defect for years, New GM did not issue a recall until 2014. Specifically, on July 3, 2014, New GM expanded its Ignition Switch Defect recall efforts by recalling 5,877,718 vehicles in the United States (NHTSA Recall No. 14V-400).

35.    The following vehicles were included in Recall No. 14V-400: 1997-2005 Chevrolet Malibu, 2000-2005 Chevrolet Impala, 2000-2005 Chevrolet Monte Carlo, 2000-2005 Pontiac Grand Am, 2004-2008 Pontiac Grand Prix, 1998-2002 Oldsmobile Intrigue, and 1999-2004 Oldsmobile Alero. All of the vehicles involved in Recall No. 14V-400 were manufactured by Old GM.

36.    The recall notice states that the weight on the key and/or road conditions or some other jarring event may cause the ignition switch to move out of the "run" position, turning off the engine. If the key is not in the "run" position, the airbags may not deploy if the vehicle is involved in a collision, increasing the risk of injury.

37.    Through this recall notice, New GM notified NHTSA and the public that the recall was intended to address a defect involving unintended or "inadvertent key rotation" within the ignition switch of the vehicles. As with the other 2014 Ignition Switch Defect-recalled vehicles, though, the defects for which these vehicles have been recalled is directly related to the ignition switch defect in the Cobalt and other Defective Ignition Switch Vehicles and involves the same safety risks and dangers as the initially recalled Defective Vehicles (i.e., those recalled under NHTSA Recall No. 14V-047). In fact, one of the lead engineers from Delphi (the ignition switch supplier for many Old GM and New GM-manufactured vehicles), Eric Mattson, testified that the Delta ignition switch in the initially-recalled Cobalts and Ions was "extremely similar" to that of the Epsilon ignition switch installed in the Recall 14V-400 vehicles.[4]

---

[4] See E. Mattson 8/20/15 MDL Dep. Tr. at 130:24-132:4.

38.     The "unintended ignition rotation defect" is substantially similar to and relates directly to the other ignition switch defects, including the Delta Ignition Switch Vehicles. Like the other ignition switch defects, the unintended ignition key rotation defect poses a serious and dangerous safety risk because it can cause a vehicle to stall while in motion by causing the key in the ignition to inadvertently move from the "on" or "run" position to "off" or "accessory" position. Like the other ignition switch defects, the unintended ignition key rotation defect can result in a loss of power steering, power braking, and increase the risk of a crash. And as with the other ignition switch defects, if a crash occurs, the airbags will not deploy because of unintended ignition key rotation.

39.     The unintended ignition key rotation defect involves several problems, and they are identical to the problems in the other Defective Ignition Switch Vehicles: a weak detent plunger/low torque force, the low positioning of the ignition on the steering column, and the algorithm that renders the airbags inoperable when the vehicle leaves the "run" position.

40.     New GM has tried to characterize the recall of these 14V-400 vehicles as being different than the Delta Ignition Switch recall even though these recalls are aimed at addressing the same defects and safety risks as those that gave rise to the other ignition switch defect recalls.

41.     New GM has attempted to portray the "unintended ignition key rotation defect" as being different from the other ignition switch defects in order to deflect attention from the severity and pervasiveness of the ISD, to try to provide a story and plausible explanation for why it did not recall these millions of other vehicles much earlier, and to avoid providing new, stronger ignition switches as a remedy. Instead, its recall repair for the 14V-400 vehicles is a key insert changing the keyhead opening from a slot to a hole, something that Old GM had considered doing on the sister-platform Delta vehicles back in 2005; however, this design change – which would have cost

approximately 50 cents per vehicle – was rejected by Old-to-New GM engineers due to cost considerations.

42. From its inception, New GM had full knowledge of the defects with the ignition switch and airbag system, and Old GM's failure to disclose those defects to NHTSA and the public. Had New GM acted when it acquired knowledge of the ignition switch defect – i.e., on July 10, 2009 -- Plaintiffs would likely not have been involved in an accident on April 10, 2010.

43. Rather than promptly recalling the Defective Vehicles, however, New GM fraudulently concealed the existence of the safety defects in the Subject Vehicles. Moreover, New GM continued to manufacture vehicles with the ignition switch defect after the bankruptcy sale. Indeed, hundreds of thousands of the vehicles manufactured by New GM have since been recalled due to the ignition switch defect.

44. Old-to-New GM engineers identified several ways to attempt to fix the ignition switch problem over the years. Unsurprisingly, these solutions echoed solutions that Old GM engineers had proposed years before the bankruptcy sale – solutions of which Old-to-New GM engineers such as Ray DeGiorgio, Alberto Manzor, David Trush, and Lori Queen were well aware – but had decided not to implement because of cost concerns. For example, New GM engineers proposed adding a shroud to prevent a driver's knee from contacting the key, modifying the key and lock cylinder to orient the key in an upward facing orientation when in the "run" position, and adding a push button to the lock cylinder to prevent it from slipping out of run. New GM ultimately rejected each of these ideas.

45. New GM's years long internal "investigation" into the Defective Vehicles—as well as all of the Old GM documents that were included in the "Purchased Assets" from the bankruptcy sale—provided New GM with actual knowledge, well before Plaintiffs' injury, of the ignition

switch defect.  Notwithstanding these facts, New GM continued to fraudulently conceal the nature and extent of the defects from the public, inducing customers to purchase Defective Vehicles with no knowledge of the existence of these serious and uniform defects, and no provision to avoid the safety risks of operating the Defective Vehicles.

46.     Moreover, throughout the entirety of its corporate existence, New GM received numerous and repeated complaints of moving engine stalls and/or power failures in the Subject Vehicles.  These complaints are yet more evidence that New GM was fully aware of the ignition switch defect and should have timely announced a recall much sooner than it did.

47.     New GM was aware of these problems year after year and nationwide, as reflected not only by the internal documents reflecting knowledge and cover-up at high levels, but also in hundreds of customer complaints recorded in Old GM's and New GM's internal complaint logs and documents.  New GM received and reviewed complaints of safety issues from customers with Defective Vehicles in nearly every state nationwide.  Documents produced by New GM show that New GM was aware of customer complaints of stalling Defective Vehicles in many of these states and ultimately did nothing about them.  These complaints, of course, are in addition to the multiple non-deploy incidents of which New GM became aware and even investigated from at least 2005 to the present.

b.     _New GM Was Aware of the Ignition Switch Defect from the Date of its Creation, but Concealed the Defect for Years_

48.     An automaker should never place profits above safety and should never conceal from consumers or the public any defects that exist in its vehicles.  New GM's Vehicle Safety Chief, Jeff Boyer, recently proclaimed that "Nothing is more important than the safety of our customers in the vehicles they drive."  _GM Announces New Vehicle Safety Chief_, _available at_ http://democrats.energycommerce.house.gov/sites/default/files/documents/Testimony-Barra-

GM-Ignition-Switch-Recall-2014-4-1.pdf.

49.     Indeed, the first priority of a car manufacturer should be to ensure that its vehicles are safe and, in particular, have safe, operable ignition systems, airbags, power-steering, power brakes, and other safety features that can prevent or minimize the threat of death or serious bodily harm in a collision.  In addition, a car manufacturer must take all reasonable steps to ensure that once a vehicle is running, it operates safely, and its critical safety systems (such as engine control, braking, steering, and airbag systems) work properly until such time as the driver shuts down the vehicle.  Moreover, a manufacturer that is aware of a dangerous design defect that causes its vehicle to shut down during operation, its power steering to revert to manual steering, its airbags not to deploy, or other potentially catastrophic system failure, must promptly disclose and remedy such defects.

50.     On July 9, 2009, the United States Bankruptcy Court approved the sale of substantially all of Old GM's assets to New GM, which retained the vast majority of Old GM's senior and management level executives and engineers who knew that Old GM had manufactured and sold millions of vehicles afflicted with an ignition switch defect.  Those employees' knowledge regarding the ignition switch defect is imputed to New GM, whenever obtained.

51.     On or around the day of its formation as an entity, New GM also acquired, *inter alia*, the knowledge of the contents of Old GM's "files" and company "documents."  To that end, New GM acquired notice of the safety-related defects contained in Old GM's files, including numerous engineering reports, investigative reports, failure analyses, technical service bulletins, and other documentation concerning the defective ignition switch and airbag systems described herein.

52.     Defendant New GM also had ongoing obligations under the Safety Act to monitor both Old GM and New GM vehicles on the road, to make quarterly reports to NHTSA, and to maintain all relevant records for five years. Defendant New GM explicitly accepted Safety Act responsibilities for Old GM vehicles in § 6.15 of the Sale Agreement through which it acquired substantially all of Old GM's assets.

53.     The Safety Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including incidents involving death or injury, claims relating to property damage received by the manufacturer, warranty claims paid by the manufacturer, consumer complaints, and field reports prepared by the manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance issues. 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21. Manufacturers must retain for five years all underlying records on which the early warning reports are based and all records containing information on malfunctions that may be related to motor vehicle safety. 49 C.F.R. §§ 576.5 to 576.6.

54.     The Safety Act further requires immediate action when a manufacturer determines or should determine that a safety defect exists. *United States v. General Motors Corp.*, 574 F. Supp. 1047, 1050 (D.D.C. 1983). A safety defect is defined by regulation to include any defect that creates an "unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle" or "unreasonable risk of death or injury in an accident." 49 U.S.C. § 30102(a)(8). Within five days of learning about a safety defect, a manufacturer must notify NHTSA and provide a description of the vehicles potentially containing the defect, including "make, line, model year, [and] the inclusive dates (month and year) of manufacture," a description of how these vehicles differ from similar vehicles not included in the recall, and "a summary of all

warranty claims, field or service reports, and other information" that formed the basis of the determination that the defect was safety related. 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)-(c). Then, "within a reasonable time" after deciding that a safety issue exists, the manufacturer must notify the owners of the defective vehicles. 49 C.F.R. §§ 577.5(a), 577.7(a). Violating these notification requirements can result in a maximum civil penalty of $15,000,000. 49 U.S.C. § 30165(a)(1).

55. Defendant New GM used several processes to identify safety issues, including the Transportation Recall Enhancement, Accountability and Documentation ("TREAD") database and Problem Resolution Tracking System ("PRTS"). The TREAD database, used to store the data required for the quarterly NHTSA early warning reports, was the principal database used by Old and New GM to track incidents related to Old and New GM vehicles. The database included information from (i) customer service requests; (ii) repair orders from dealers; (iii) internal and external surveys; (iv) field reports from employees who bought Old and New GM vehicles and from Captured Test Fleet reports; (v) complaints from the OnStar call center; and (vi) a database maintained by Old and New GM legal staff to track data concerning complaints filed in court. A TREAD reporting team would conduct monthly database searches and prepare scatter graphs to identify spikes in the number of accidents or complaints related to various Old and New GM vehicles. The PRTS is a database that tracks engineering problems identified in testing, manufacturing, through warranty data, and through customer feedback. The PRTS process involves five steps: identification of the issue; identification of the root cause; identification of a solution; implementation of the solution; and feedback.

56. Because the same employees carried out the TREAD Act obligations at Old GM and Defendant New GM, they not only retained the knowledge they acquired at Old GM—they

were in fact required to do so.  This further supports the propriety of imputing the knowledge of Old GM employees to New GM, even where that knowledge stems in part from their performance of the same or similar roles at Old GM.

57.    In setting forth the knowledge and conduct of Old GM in connection with the ignition switch and other defects set forth herein, Plaintiffs allege that New GM is liable for the actions of Old GM only with respect to the Products Liability claims for compensatory damages, which are an Assumed Liability.  With respect to Plaintiffs' Independent Claims, Plaintiffs do not seek to hold Defendant New GM liable for the actions of Old GM.  Instead, the knowledge and conduct of Old GM is generally important and relevant because it is imputed to Defendant New GM under governing principles of agency law.

58.    From the day of its formation as a corporate entity, through the knowledge of Old GM employees familiar with this information who continued on at New GM after the bankruptcy sale and Old GM documents retained in New GM's files, New GM acquired notice and full knowledge of the ignition switch defect in Old GM vehicles.

59.    New GM acquired knowledge of the defects in the Defective Vehicles on or shortly after July 11, 2009, when the Bankruptcy Sale was finalized.  On that date, it acquired knowledge of the following facts through the knowledge of personnel who transferred from Old GM as well as through databases and documents that transferred to New GM, as discussed above:

        a.    New GM knew that, in January of 2003, Old GM opened an internal investigation after it received complaints from a Michigan GM dealership that a customer had experienced a power failure while operating his model year 2003 Pontiac Grand Am.

b.  New GM knew that, during the investigation, Old GM's Brand Quality Manager for the Grand Am visited the dealership and requested that the affected customer demonstrate the problem. The customer was able to recreate the shutdown event by driving over a speed bump at approximately 30-35 mph.

c.  New GM knew that the customer's key ring was allegedly quite heavy. It contained approximately 50 keys and a set of brass knuckles.

d.  New GM knew that in May 2003, Old GM issued a voicemail to dealerships describing the defective ignition condition experienced by the customer in the Grand Am. Old GM identified the relevant population of the Affected Vehicles as the 1999-2003 Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am.

e.  New GM knew that Old GM did not recall these vehicles. Nor did it provide owners and/or lessees with notice of the defective condition. Instead, its voicemail directed dealerships to pay attention to the key size and mass of the customer's key ring.

f.  New GM knew that, on July 24, 2003, Old GM issued an engineering work order to increase the detent plunger force on the ignition switch for the 1999-2003 Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am vehicles. Old GM engineers allegedly increased the detent plunger force and changed the part number of the ignition switch. The new parts were installed beginning in the model year 2004 Malibu, Alero, and Grand Am vehicles.

g.  New GM knew that Old GM issued a separate engineering work order in March 2004 to increase the detent plunger force on the ignition switch in the Pontiac Grand Prix. Old GM engineers did not change the part number for the new Pontiac Grand Prix ignition switch.

21

h.   New GM knew that Old-to-New GM design engineer Ray DeGiorgio signed the work order in March 2004 authorizing the part change for the Grand Prix ignition switch. Ray DeGiorgio maintained his position as design engineer with New GM.

i.   New GM knew that, on or around August 25, 2005, Laura Andres, an Old GM design engineer (who remains employed with New GM), sent an email describing ignition switch issues that she experienced while operating a 2006 Chevrolet Impala on the highway. Ms. Andres' email stated, "While driving home from work on my usual route, I was driving about 45 mph, where the road changes from paved to gravel & then back to paved, some of the gravel had worn away, and the pavement acted as a speed bump when I went over it. The car shut off. I took the car in for repairs. The technician thinks it might be the ignition detent, because in a road test in the parking lot it also shut off."

j.   New GM knew that Old GM employee Larry S. Dickinson, Jr. forwarded Ms. Andres' email on August 25, 2005 to four Old GM employees. Mr. Dickinson asked, "Is this a condition we would expect to occur under some impacts?"

k.   New GM knew that on August 29, 2005, Old GM employee Jim Zito forwarded the messages to Ray DeGiorgio and asked, "Do we have any history with the ignition switch as far as it being sensitive to road bumps?"

l.   New GM knew that DeGiorgio responded the same day, stating, "To date there has never been any issues with the detents being too light," despite the fact that he *was* aware of issues with the detents being too light in the ignition switches on multiple vehicle platforms.

60. Old GM also knew that NHTSA believed that in most, if not all vehicles, the airbag systems were operable for several seconds following a power loss. Thus, Old GM knew that NHTSA was mistaken and did nothing to correct NHTSA's mistaken belief.

61. From 2002 to the present, first Old GM and then New GM received numerous reports from consumers regarding complaints, crashes, injuries, and deaths linked to this safety defect, and New GM was aware of all of them. The following are just a handful of examples of some of the reports known to New GM.

62. New GM knew of a September 16, 2002 complaint filed with NHTSA regarding a 2002 Oldsmobile Intrigue involving an incident that occurred on March 16, 2002, in which the following was reported:

> WHILE DRIVING AT 30 MPH CONSUMER RAN HEAD ON INTO A STEEL GATE, AND THEN HIT THREE TREES. UPON IMPACT, NONE OF THE AIR BAGS DEPLOYED. CONTACTED DEALER. PLEASE PROVIDE FURTHER INFORMATION. *AK **NHTSA ID Number**: 8018687.

63. New GM knew of a June 30, 2003 complaint filed with NHTSA regarding a 2001 Oldsmobile Intrigue which involved the following report:

> CONSUMER NOTICED THAT WHILE TRAVELING DOWN HILL AT 40-45 MPH BRAKES FAILED, CAUSING CONSUMER TO RUN INTO THREES AND A POLE. UPON IMPACT, AIR BAGS DID NOT DEPLOY. *AK **NHTSA ID Number**: 10026252.

64. New GM knew of a March 11, 2004 complaint with NHTSA regarding a 2003 Oldsmobile Alero incident that occurred on July 26, 2003, in which the following was reported:

> THE VEHICLE DIES. WHILE CRUISING AT ANY SPEED, THE HYDRAULIC BRAKES & STEERING FAILED DUE TO THE ENGINE DYING. THERE IS NO SET PATTERN, IT MIGHT STALL 6 TIMES IN ONE DAY, THEN TWICE THE NEXT DAY. THEN GO 4 DAYS WITH NO OCURRENCE, THEN IT WILL STALL ONCE A DAY FOR 3 DAYS. THEN GO A WEEK WITH NO OCURRENCE, THEN STALL 4 TIMES A DAY FOR 5 DAYS, ETC., ETC. . . .

23

AT HIGH SPEEDS, IT IS EXTREMELY TOO DANGEROUS TO DRIVE. WE'VE TAKEN IT TO THE DEALER, UNDER EXTENDED WARRANTY, THE REQUIRED 4 TIMES UNDER THE LEMON LAW PROCESS. THE DEALER CANNOT ASCERTAIN, NOR FIX THE PROBLEM. IT HAPPENED TO THE DEALER AT LEAST ONCE WHEN WE TOOK IT IN. I DOUBT THEY WILL ADMIT IT, HOWEVER, MY WIFE WAS WITNESS. THE CAR IS A 2003. EVEN THOUGH I BOUGHT IT IN JULY 2003, IT WAS CONSIDERED A USED CAR. GM HAS DENIED OUR CLAIM SINCE THE LEMON LAW DOES NOT APPLY TO USED CARS. THE CAR HAS BEEN PERMANENTLY PARKED SINCE NOVEMBER 2003. WE WERE FORCED TO BUY ANOTHER CAR. THE DEALER WOULD NOT TRADE. THIS HAS RESULTED IN A BADLUCK SITUATION FOR US. WE CANNOT AFFORD 2 CAR PAYMENTS / 2 INSURANCE PREMIUMS, NOR CAN WE AFFORD $300.00 PER HOUR TO SUE GM. I STOPPED MAKING PAYMENTS IN DECEMBER 2003. I HAVE KEPT THE FINANCE COMPANY ABREAST OF THE SITUATION. THEY HAVE NOT REPOSSED AS OF YET. THEY WANT ME TO TRY TO SELL IT. CAN YOU HELP? *AK **NHTSA ID NUMBER:** 10061898.

65.   New GM knew of an August 23, 2004 complaint filed with NHTSA regarding a

2004 Chevrolet Malibu incident that occurred on June 30, 2004, in which it was reported that:

WHILE TRAVELING AT ANY SPEED VEHICLE STALLED. WITHOUT CONSUMER HAD SEVERAL CLOSE CALLS OF BEING REAR ENDED. VEHICLE WAS SERVICED SEVERAL TIMES, BUT PROBLEM RECURRED. *AK. **NHTSA ID Number:** 10089418.

66.   New GM knew of another report in August 2004 involving a 2004 Chevrolet

Malibu incident that occurred on August 3, 2004, in which it was reported that:

WHEN DRIVING, THE VEHICLE TO CUT OFF. THE DEALER COULD NOT FIND ANY DEFECTS. *JB. **NHTSA ID Number:** 10087966.

67.   New GM knew of an October 23, 2004 complaint with NHTSA regarding a 2003

Chevrolet Monte Carlo, in which the following was reported:

VEHICLE CONTINUOUSLY EXPERIENCED AN ELECTRICAL SYSTEM FAILURE. AS A RESULT, THERE WAS AN ELECTRICAL SHUT DOWN WHICH RESULTED IN THE ENGINE DYING/ STEERING WHEEL LOCKING UP, AND LOSS OF BRAKE POWER.*AK **NHTSA ID Number:** 10044624.

68.    New GM knew of an April 26, 2005 complaint filed with NHTSA involving a 2005

Pontiac Grand Prix, pertaining to an incident that occurred on December 29, 2004, in which the

following was reported:

> 2005 PONTIAC GRAND PRIX GT SEDAN VIN #[XXX] PURCHASED 12/16/2004. INTERMITTENTLY VEHICLE STALLS/ LOSS OF POWER IN THE ENGINE. WHILE DRIVING THE VEHICLE IT WILL SUDDENLY JUST LOSES POWER. YOU CONTINUE TO PRESS THE ACCELERATOR PEDAL AND THEN THE ENGINE WILL SUDDENLY TAKE BACK OFF AT A GREAT SPEED. THIS HAS HAPPENED WHILE DRIVING NORMALLY WITHOUT TRYING TO ACCELERATE AND ALSO WHILE TRYING TO ACCELERATE. THE CAR HAS LOST POWER WHILE TRYING TO MERGE IN TRAFFIC. THE CAR HAS LOST POWER WHILE TRYING TO CROSS HIGHWAYS. THE CAR HAS LOST POWER WHILE JUST DRIVING DOWN THE ROAD. GMC HAS PERFORMED THE FOLLOWING REPAIRS WITHOUT FIXING THE PROBLEM. 12/30/2004 [XXX]- MODULE, POWERTRAIN CONTROL-ENGINE REPROGRAMMING. 01/24/2005 [XXX]-SOLENOID, PRESSURE CONTROL-REPLACED. 02/04/2005 [XXX]-MODULE, PCM/VCM-REPLACED. 02/14/2005 [XXX]- PEDAL, ACCELERATOR-REPLACED. DEALERSHIP PURCHASED FROM CAPITAL BUICK-PONTIAC-GMC 225-293-3500. DEALERSHIP HAS ADVISED THAT THEY DO NOT KNOW WHAT IS WRONG WITH THE CAR. WE HAVE BEEN TOLD THAT WE HAVE TO GO DIRECT TO PONTIAC WITH THE PROBLEM. HAVE BEEN IN CONTACT WITH PONTIAC SINCE 02/15/05. PONTIAC ADVISED THAT THEY WERE GOING TO RESEARCH THE PROBLEM AND SEE IF ANY OTHER GRAND PRI WAS REPORTING LIKE PROBLEMS. SO FAR THE ONLY ADVICE FROM PONTIAC IS THEY WANT US TO COME IN AND TAKE ANOTHER GRAND PRIX OFF THE LOT AND SEE IF WE CAN GET THIS CAR TO DUPLICATE THE SAME PROBLEM. THIS DID NOT IMPRESS ME AT ALL. SO AFTER WAITING FOR 2-1/2 MONTHS FOR PONTIAC TO DO SOMETHING TO FIX THE PROBLEM, I HAVE DECIDED TO REPORT THIS TO NHTSA. *AK *JS INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6) NHTSA ID Number: 10118501.

69.    New GM knew of a May 31, 2005 complaint filed with NHTSA regarding a 2004

Chevrolet Malibu incident that occurred on July 18, 2004, in which it was reported that:

> THE CAR CUT OFF WHILE I WAS DRIVING AND IN HEAVY TRAFFIC MORE THAN ONCE. THERE WAS NO WARNING THAT THIS WOULD HAPPEN. THE CAR WAS SERVICED BEFORE FOR THIS PROBLEM BUT IT CONTINUED TO HAPPEN. I HAVE HAD 3 RECALLS, THE HORN FUSE

HAS BEEN REPLACED TWICE, AND THE BLINKER IS CURRENTLY OUT. THE STEERING COLLAR HAS ALSO BEEN REPLACED. THIS CAR WAS SUPPOSED TO BE A NEW CAR. **NHTSA ID Number**: 10123684.

70.    New GM knew of a June 2, 2005 complaint filed with NHTSA regarding a 2004

Pontiac Grand Am incident that occurred on February 18, 2005, in which it was reported that:

2004 PONTIAC GRAND PRIX SHUTS DOWN WHILE DRIVING AND THE POWER STEERING AND BRAKING ABILITY ARE LOST.*MR *NM. **NHTSA ID Number**: 10124713.

71.    New GM knew of an August 26, 2005 complaint filed with NHTSA regarding a

2004 Pontiac Grand Am incident that occurred on August 26, 2005, in which the following was

reported:

WHILE DRIVING MY 2004 PONTIAC GRAND AM THE CAR FAILED AT 30 MPH. IT COMPLETELY SHUT OFF LEAVING ME WITH NO POWER STEERING AND NO WAY TO REGAIN CONTROL OF THE CAR UNTIL COMING TO A COMPLETE STOP TO RESTART IT. ONCE I HAD STOPPED IT DID RESTART WITHOUT INCIDENT. ONE WEEK LATER THE CAR FAILED TO START AT ALL NOT EVEN TURNING OVER. WHEN THE PROBLEM WAS DIAGNOSED AT THE GARAGE IT WAS FOUND TO BE A FAULTY "IGNITION CONTROL MODULE" IN THE CAR. AT THIS TIME THE PART WAS REPLACED ONLY TO FAIL AGAIN WITHIN 2 MONTHS TIME AGAIN WHILE I WAS DRIVING THIS TIME IN A MUCH MORE HAZARDOUS CONDITION BEING THAT I WAS ON THE HIGHWAY AND WAS TRAVELING AT 50 MPH AND HAD TO TRAVEL ACROSS TWO LANES OF TRAFFIC TO EVEN PULL OVER TO TRY TO RESTART IT. THE CAR CONTINUED TO START AND SHUT OFF ALL THE WAY TO THE SERVICE GARAGE WHERE IT WAS AGAIN FOUND TO BE A FAULTY "IGNITION CONTROL MODULE". IN ANOTHER TWO WEEKS TIME THE CAR FAILED TO START AND WHEN DIAGNOSED THIS TIME IT WAS SAID TO HAVE "ELECTRICAL PROBLEMS" POSSIBLE THE "POWER CONTROL MODULE". AT THIS TIME THE CAR IS STILL UNDRIVEABLE AND UNSAFE FOR TRAVEL. *JB **NHTSA ID Number:** 10134303.

72.    New GM knew of a December 10, 2008 complaint filed with NHTSA regarding a

2004 Oldsmobile Alero and an incident that occurred on December 10, 2008, in which the

following was reported:

I WAS DRIVING DOWN THE ROAD IN RUSH HOUR GOING APPROX. 55 MPH AND MY CAR COMPLETELY SHUT OFF, THE GAUGES SHUT DOWN, LOST POWER STEERING. HAD TO PULL OFF THE ROAD AS SAFELY AS POSSIBLE, PLACE VEHICLE IN PARK AND RESTART CAR. MY CAR HAS SHUT DOWN PREVIOUSLY TO THIS INCIDENT AND FEEL AS THOUGH IT NEEDS SERIOUS INVESTIGATION. I COULD HAVE BEEN ON THE HIGHWAY AND BEEN KILLED. THIS ALSO HAS HAPPENED WHEN IN A SPIN OUT AS WELL THOUGH THIS PARTICULAR INCIDENT WAS RANDOM. *TR **NHTSA ID Number:** 10251280.

73.    New GM knew of a March 31, 2009 complaint filed with NHTSA regarding a 2005 Chevrolet Malibu incident that occurred on May 30, 2008, in which the following was reported:

TL*THE CONTACT OWNS A 2005 CHEVROLET MALIBU. THE CONTACT STATED THAT THE POWER WINDOWS, LOCKS, LINKAGES, AND IGNITION SWITCH SPORADICALLY BECOME INOPERATIVE. SHE TOOK THE VEHICLE TO THE DEALER AND THEY REPLACED THE IGNITION SWITCH AT THE COST OF $495. THE MANUFACTURER STATED THAT THEY WOULD NOT ASSUME RESPONSIBILITY FOR ANY REPAIRS BECAUSE THE VEHICLE EXCEEDED ITS MILEAGE. ALL REMEDIES AS OF MARCH 31, 2009 HAVE BEEN INSUFFICIENT IN CORRECTING THE FAILURES. THE FAILURE MILEAGE WAS 45,000 AND CURRENT MILEAGE WAS 51,000. **NHTSA ID Number**: 10263716.

74.    The defects did not get any safer and the reports did not stop when Old GM ceased to exist. To the contrary, New GM continued receiving the same reports involving the same defects. For example, in September 2010, New GM executives, including Executive Vice President and President of General Motors North America Alan Batey,[5] former New GM Chairman of the Board and CEO of General Motors LLC Daniel Akerson,[6] President of General Motors LLC Dan Ammann,[7] and New GM's Vice President of Global Vehicle Program Management Terry Woychowski,[8] received customer emails regarding stalling incidents involving

---

[5] *See* https://www.gm.com/company/leadership/corporate-officers.html (last accessed May 17, 2018).
[6] *Id.*
[7] *Id.*
[8] Sept. 9, 2010, email chain with D. Amman, D. Akerson, A. Batey, M. Reuss, T. Woychowski, et al. re: "Highway Stalling Issue email of 8/29/10," GM-MDL2543-402227584, at -7584.

a 2000 Chevrolet Malibu and a 2003 Chevrolet Malibu traveling at highway speeds. In describing

one such incident, the owner of the 2000 Malibu wrote the following:

> "We spent approximately $648 in March 2009 with a GM dealership, because the
> car stalled on the highway, practically killing our family of five. . . . It again nearly
> killed our family of five on August 28, 2010!  The dealership states that we are 'out
> of warranty.'  Before initiating a 'class-action lawsuit' with other individuals that
> have experienced this identical issue, I would like to request [that] you . . . correct
> this 'issue.'"[9]

75.     A few days later, while driving his other Chevrolet Malibu (the 2003 model year),

the vehicle owner stated, "[T]he 2003 Chevy Malibu stalled in the left hand lane of the freeway in

the identical manner that the 2000 Chevy Malibu did on August 28, 2010. . . . We therefore cannot

use either the 2003 or the 2000 Malibu on the freeway."[10]

76.     In a prophetic follow-up email dated September 7, 2010, the owner of the Malibus

explained to the New GM representatives, "**As discussed, curiously enough, the solution to both**

**stalling issues was a brand new ignition switch for each car**."[11]

77.     At least as early as May 12, 2013, New GM became aware of a complaint filed

with NHTSA regarding a 2005 Chevrolet Malibu incident that occurred on May 11, 2012, in which

the following was reported:

> I WAS AT A STOP SIGN WENT TO PRESS GAS PEDAL TO TURN ONTO
> ROAD AND THE CAR JUST SHUT OFF NO WARNING LIGHTS CAME ON
> NOR DID IT SHOW ANY CODES. GOT OUT OF CAR POPPED TRUNK
> PULLED RELAY FUSE OUT PUT IT BACK IN AND IT CRANKED UP, THEN
> ON MY WAY HOME FROM WORK, GOING ABOUT 25 MPH AND IT JUST
> SHUT DOWN AGAIN, I REPEATED PULLING OUT RELAY FUSE AND PUT
> IT BACK IN THEN WAITED A MINUTE THEN IT CRANKED AND I DROVE
> STRAIGHT HOME. *TR **NHTSA ID Number:** 10458198.

---

[9] *Id.* at -7589.
[10] *Id.* at -7588.
[11] *Id.* at -7587.

78.     On February 26, 2014, New GM was reminded of a complaint filed with NHTSA involving a 2004 Pontiac Grand Prix, concerning an incident that occurred on May 10, 2005, in which the following was reported:

> TL – THE CONTACT OWNS A 2004 PONTIAC GRAND PRIX. THE CONTACT STATED THAT WHILE DRIVING AT VARIOUS SPEEDS AND GOING OVER A BUMP, THE VEHICLE WOULD STALL WITHOUT WARNING. THE VEHICLE WAS TAKEN TO THE DEALER. THE TECHNICIAN WAS UNABLE TO DIAGNOSE THE FAILURE. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE VEHICLE WAS NOT REPAIRED. THE VIN WAS NOT AVAILABLE. THE FAILURE MILEAGE WAS 12,000 AND THE CURRENT MILEAGE WAS 82,000. KMJ **NHTSA ID Number:** 10566118.

79.     On March 13, 2014, New GM became aware of a complaint filed with NHTSA involving a 2006 Pontiac Grand Prix and an incident that occurred on February 27, 2014, in which a driver reported:

> I WAS DRIVING HOME FROM WORK AND WHEN I TURNED A CORNER, THE ENGINE CUT OUT. I BELIEVE IT WAS FROM THE KEY FLIPPING TO ACCESSORY. I'VE HEARD THAT THIS HAS CAUSED CRASHES THAT HAVE KILLED PEOPLE AND WOULD LIKE THIS FIXED. THIS IS THE FIRST TIME IT HAPPENED, BUT NOW I'M WORRIED EVERY TIME I DRIVE IT THAT THIS IS GOING TO HAPPEN AND I DON'T FEEL SAFE LETTING MY WIFE DRIVE THE CAR NOW. WHY ARE THE 2006 PONTIAC GRAND PRIX VEHICLES NOT PART OF THE RECALL FROM GM? **\*TR NHTSA ID Number: 10569215.**

80.     At least as early as April 8, 2014, New GM became aware of a complaint filed with NHTSA regarding a 2003 Chevrolet Impala and an incident that occurred on August 14, 2011, in which the following was reported:

> I HAVE HAD INCIDENTS SEVERAL TIMES OVER THE YEARS WHERE I WOULD HIT A BUMP IN THE ROAD AND MY CAR WOULD COMPLETLY SHUT OFF. I HAVE ALSO HAD SEVERAL INCIDENTS WHERE I WAS TRAVELING DOWN THE EXPRESSWAY AND MY CAR TURNED OFF ON ME. I HAD TO SHIFT MY CAR INTO NEUTRAL AND RESTART IT TO CONTINUE GOING. I WAS FORTUNATE NOT TO HAVE AN ACCIDENT. **NHTSA ID Number:** 10578158.

81. New GM was aware of these problems year after year and nationwide, as reflected not only by internal documents reflecting knowledge and cover-up at high levels, but also in hundreds of customer complaints recorded in Old GM's and New GM's internal complaint logs and documents. New GM received and reviewed complaints of safety issues from customers with Defective Vehicles in nearly every state nationwide. Documents produced by New GM show that New GM was aware of customer complaints of stalling Defective Vehicles across the country and ultimately did nothing about them. These complaints, of course, are in addition to the multiple non-deploy incidents of which New GM became aware, which Old GM investigated from at least as early as 2005, and which New GM investigated from on or around the date of its inception in 2009, and yet no recalls were issued for the Defective Vehicles until 2014.

c.    *Old GM's Marketing Represented to the Public that the Defective Vehicles Were Safe, and New GM Did Nothing to Correct These Representations – Indeed, It Reinforced Them*

82. In a section called "safety," Old GM's Chevrolet website stated:

**OUR COMMITMENT**

Your family's safety is important to us. Whether it's a short errand around town or a cross-country road trip, Chevrolet is committed to keeping you and your family safe — from the start of your journey to your destination. That's why every Chevrolet is designed with a comprehensive list of safety and security features to help give you peace of mind. Choose from the safety features below to learn more about how they work, and which Chevy vehicles offer them.

83. In sum, Old GM touted the safety of its vehicles to increase sales, but, when the time came for the company to stay true to its words, Old GM did not disclose its knowledge about the dangerous Key System defects to its customers, including the Plaintiffs. And, more

importantly, New GM did nothing to correct any such representations, and indeed only propounded them with additional safety representations made by New GM about GM-brand vehicles.[12]

84.    As will be shown at trial, all the foregoing knowledge of Old GM in all the preceding paragraphs was inherited by or is imputable to New GM within the meaning of the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in *Motors Liquidation Company, et al., f/k/a General Motors Corp., et al.*, Case No. 09-50026 (REG)**.**

> d.    *New GM Finally Issues Recalls Related to Ignition Switch Defects*

85.    On February 7, 2014, New GM, in a letter from Carmen Benavides, Director of Product Investigations and Safety Regulations for New GM, notified the NHTSA that it was conducting what it internally referred to as New GM Recall No. 13454 for certain 2005-2007 model year Chevrolet Cobalts and 2007 model year Pontiac G5 vehicles.  In its February 7, 2014,

---

[12] *See*, *e.g.*, GM-MDL2543-401298621 at -8646 (2010 Chevy-brand vehicle brochure proclaiming, "Chevrolet is a leader in technologies that make driving easy, safe, and entertaining"); GM-MDL2543-101495318 (2011 New GM radio advertisement stating, in pertinent part: "...Proud moments of being the ones who put you first, with safety-conscious cars including IIHS 2011 top safety picks like Chevy Malibu..."); GM-MDL2543-101494809 (2010 New GM television advertisement touting, "There are sixteen Chevy models with a five-star frontal crash safety rating. That's peace of mind for every size family."); GM-MDL2543-101494843, New GM television advertisement depicting extensive crash testing of Chevrolet brand vehicles and touting the Chevrolet brand by stating, in pertinent part, "Everyone deserves a car they can count on.  A car that keeps going when others might quit.  A car that stands strong when you need it most, and expects to handle the unexpected.  At Chevrolet, we created a team of Red-X engineers who are obsessed with quality.  Red-X torture tests every car down to the smallest detail.  We're pushing the limits every single day, and for one reason: our mission is to build the best cars and trucks in the world..."); GM-MDL2543-101494865 (New GM television advertisement asserting that Chevy vehicles are "among the safest on earth"); GM-MDL2543-006788829, New GM brand-wide television advertisement, at 0:55-1:04 (Screen text reading, "Nobody offers more cars and trucks that can help save your life before, during and after a crash," followed by images of the General Motors brand logos (Chevrolet, Pontiac, Buick, Cadillac, GMC, Saturn, Saab, and Hummer), followed by screen text reading, "Only GM"); GM-MDL2543-006816884 (New GM product representative responding to Yahoo forum inquiry dated 1/14/12: "The Malibu has a sleek design, offers a plush roomy interior, is fuel efficient and most importantly, is safe!  The Malibu is a Consumers Digest Best Buy and is a Top Safety Pick by the Insurance Institute for Highway Safety."); GM-MDL2543-301449729 at -9745 (October 2013 New GM publication touting multiple model years of the Chevrolet Malibu as being "Top Safety Picks").

letter to NHTSA, New GM represented that as replacement ignition switches became available, GM would replace the ignition switches on *those* Defective Vehicles.[13]

86.    New GM Recall No. 13454 was given NHTSA Recall Campaign No. 14V-047. The 14V-047 recall notice reported that the ignition switch "may turn off" in certain GM-brand vehicles, and that "[t]his defect can affect the safe operation of the airbag system."  New GM advised that until the defect was repaired, "customers should remove all items from their key rings, leaving only the ignition key.  The key fob (if applicable) should also be removed from the key ring."  The 14V-047 recall campaign initially involved 619,122 model year 2005-07 Chevrolet Cobalt and 2007 Pontiac G5 vehicles.  New GM later increased the recall to include an additional 748,024 model year 2006-07 Chevrolet HHR and Pontiac Solstice vehicles and 2003-2007 Saturn Ion vehicles and 2007 Saturn Sky vehicles.  Approximately a month later, New GM again expanded the recall to include 2008-2010 Chevrolet Cobalt, Saturn Sky, and Pontiac G5 and Solstice, as well as 2008-2011 Chevrolet HHR vehicles.

87.    On February 19, 2014, a request for timeliness query of New GM's Safety Recall 13454 was sent to NHTSA.  The timeliness query pointed out that New GM had failed to recall all of the vehicles with the defective ignition switches.  The February 19, 2014 request for timeliness query also asked NHTSA to investigate New GM's failure to fulfill its legal obligation to report the safety-related defects in the Defective Vehicles to NHTSA within five days of discovering the defect.

88.    On February 24, 2014, New GM in a letter from Carmen Benavides, informed NHTSA it was expanding the 14V-047 recall to include the 2006-2007 model year ("MY") Chevrolet HHR and Pontiac Solstice, 2003-2007 MY Saturn Ion, and 2007 MY Saturn Sky

---

[13] For the later-recalled Defective Vehicles, New GM only provided a key insert as the recall repair, and did not replace the defective ignition switches themselves.

vehicles.  New GM included a defect chronology as an attachment to the February 24, 2014 letter.

In the chronology, New GM **for the first time** admitted that Old GM previously authorized a

change in the ignition switch.  Specifically, New GM stated:

> On April 26, 2006, the GM design engineer responsible for the Cobalt's ignition switch signed a document approving changes to the ignition switch proposed by the supplier, Delphi Mechatronics.  The approved changes included, among other things, the use of a new detent plunger and spring that increased torque force in the ignition switch.  This change to the ignition switch was not reflected in a corresponding change in the part number for the ignition switch.  GM believes that the supplier began providing the re-designed ignition switch to GM at some point during the 2007 model year.[14]

89.    New GM then produced documents in response to Congressional requests leading

up to the hearings on April 1 and 2, 2014.  Among the documents produced by New GM is a

document titled, "GENERAL MOTORS COMMODITY VALIDATION SIGN-OFF," dated April

26, 2006.  According to this document, Delphi had met all of the sign-off requirements in order to

produce a new ignition switch for certain Old GM vehicles. New GM has acknowledged that the

ignition switch in the Cobalt was included in this design change.  Much like the aforementioned

Engineering Work Orders relating to the 14V400-recalled vehicles,[15] the design change included

a new detent plunger "to increase torque force in the switch."  Old-to-New GM engineer Ray

DeGiorgio's signature is on this page as the Old GM authorized engineer who signed off on this

change to the ignition switch.  This Old GM Commodity Validation Sign-Off shows that

DeGiorgio repeatedly perjured himself during his deposition on April 29, 2013.  DeGiorgio

perjured himself in order to fraudulently conceal evidence from Plaintiffs that Old GM had signed

off on the change in the ignition switch so that the Plaintiffs, and ultimately a jury, would never

know that Old GM was changing the switches in 2007 and later model year ISD-afflicted vehicles

---

[14] GM-MDL2543-002443075 at -3076.
[15] *See supra* ¶¶ 53(f)-(h); *see also infra* ¶ 84.

and concealing these changes. DeGiorgio perjured himself in his capacity as a New GM representative when he signed the errata sheet confirming that all the testimony was true and accurate.

90.    Notably, though, DeGiorgio had done the *exact same thing* with respect to the ignition switches in the vehicle group subject to the 14V400 recall. In July 2003, DeGiorgio approved a running change to increase the detent plunger force on the ignition switch installed in the Chevrolet Malibu, Pontiac Grand Am, and the Oldsmobile Alero beginning in model year 2004, without recalling or fixing the prior model years (including Plaintiff Seals' 1997 Chevrolet Malibu).[16] In March 2004, DeGiorgio approved an increase to the detent plunger force on an additional model vehicle subject to NHTSA Recall 14V400 (the Pontiac Grand Prix) without changing the part number and without taking measures to ensure that the old switch would not be used to service vehicles subject to NHTSA Recall 14V400.[17]  Thereafter, DeGiorgio continued in his same employment role at New GM, and carried the aforementioned knowledge with him into said capacity at New GM.

91.    By spring 2014, the Ignition Switch Defect recall expansions began in full force. First, in June 2014, New GM recalled the 2010-2014 Chevrolet Camaro vehicles as part of NHTSA Safety Recall Campaign Number 14V346.  According to New GM, in those vehicles, the ignition switch was defective such that the driver may accidentally hit the switch with his/her knee, unintentionally knocking the key out of the run position, turning off the engine.  If the key is not in the run position, as amply described above, the airbags may not deploy in a crash, increasing the risk of injury, and it could cause engine power, power steering, and power braking loss,

---

[16] *See* GM-MDL2543-300232728.
[17] *See* GM-MDL2543-300301398.

increasing the risk of a crash. This knee-key rotation risk was equally present in the previously recalled ISD vehicles.[18]

92.    Later in June 2014, New GM recalled another 3.1 million vehicles as part of NHTSA Campaign Number 14V355 for inadvertent switch rotation defects that may cause the ignition switch to turn off.  The 2005-2009 Buick LaCrosse, 2006-2011 Buick Lucerne, 2000-2005 Cadillac DeVille, 2006-2011 Cadillac DTS, 2006-2014 Chevrolet Impala, and 2006-2007 Chevrolet Monte Carlo vehicles were included.  "In the affected vehicles, the weight on the key ring and road conditions or some other jarring event may cause the ignition switch to move out of the run position, turning off the engine."  If the key is not in the run position, as amply described above, the airbags may not deploy in a crash, increasing the risk of injury, and it could cause engine power, power steering, and power braking loss, increasing the risk of a crash. This exact sort of rotation risk was present in the vehicles that were previously recalled for the ISD.[19]

93.    In July 2014, New GM recalled another 6.7 million vehicles as part of NHTSA Campaign Number 14V400 for inadvertent switch rotation defects.  The 2000-2005 Chevrolet Impala and Monte Carlo, 1997-2003 Chevrolet Malibu, 2004-2005 Malibu Classic, 1999-2004 Oldsmobile Alero, 1998-2002 Oldsmobile Intrigue, 1999-2005 Pontiac Grand Am, and 2004-2008 Pontiac Grand Prix vehicles were included.  Again, the same defect language appeared in the recall

---

[18] *See, e.g.*, Valukas Report at 57 n. 219 (emphasis added) ("GM employees were also having problems with their own MY 2004 Ions. A January 9, 2004 Report received from GM employee Gerald A. Young stated, 'The ignition switch is too low. *All other keys and the key fob hit on the driver's right knee*. The switch should be raised at least one inch toward the wiper stalk,' characterizing it as 'a basic design flaw that should be corrected if we want repeat sales.'  In a February 19, 2004 Report, GM employee Onassis Matthews stated: "The location of the ignition key was in the general location where my knee would rest (I am 6'3" tall, not many places to put my knee).  On several occasions, I inadvertently turn [sic] the ignition key off with my knee while driving down the road.  For a tall person, the location of the ignition key should be moved to a place that will not be inadvertently switched to the off position.'  Finally, in an April 15, 2004 Report, GM employee Raymond P. Smith reported experiencing a one-time inadvertent shut-off: "I thought that my knee had inadvertently turned the key to the off position.'").

[19] *See, e.g.*, Feb. 7, 2014, GM 573 Ltr. to NHTSA re: Recall No. 14V047, GM-MDL2543-000959894 (emphasis added) ("If the torque performance is not to specification, *and the key ring is carrying added weight or the vehicle goes off road or experiences some other jarring event*, the ignition switch may inadvertently be moved out of the 'run' position to the 'accessory' or 'off' position.").

notice: "If the key ring is carrying added weight and the vehicle goes off road or experiences some other jarring event, it may unintentionally move the key away from the 'run' position. If this occurs, engine power, power steering and power braking may be affected, increasing the risk of a crash. The timing of the key movement out of the 'run' position. . . may result in the airbags not deploying."[20]  If the key is not in the run position, as amply described above, the airbags may not deploy in a crash, increasing the risk of injury, and it could cause engine power, power steering, and power braking loss, increasing the risk of a crash.

94.    Also in July 2014, New GM recalled certain vehicles as part of NHTSA Campaign Number 14V394 for inadvertent switch rotation defects. The 2003-2014 Cadillac CTS vehicles manufactured August 16, 2001 to April 28, 2014, and 2004-2006 Cadillac SRX vehicles manufactured March 20, 2003 to August 11, 2006 were included.  Once again, New GM described the defect as follows: "If the key ring is carrying added weight and the vehicle goes off road or experiences some other jarring event, or if the driver unintentionally bumps the key ring or items attached to the key ring with their knee, he key may unintentionally move away from the 'run' position.  If this occurs, engine power, power steering and power braking may be affected, increasing the risk of a crash. The timing of the key movement out of the 'run' position . . . may result in the airbags not deploying."[21]

95.    In September 2014, New GM recalled certain vehicles as part of NHTSA Campaign Number 14V540.  The 2011-2013 Chevrolet Caprice vehicles manufactured from October 15, 2010 to December 6, 2013 and 2008-2009 Pontiac G8 vehicles manufactured July 25, 2007, to February 18, 2009 were included.  New GM characterized this ISD recall as being of the knee-key

---

[20] Jul. 3, 2014, GM 573 Ltr. to NHTSA re: Recall No. 14V400, GM-MDL2543-100687234.
[21] Jul. 2, 2014, GM 573 Ltr. to NHTSA re: Recall No. 14V394, GM-MDL2543-100270485.

variety, which of course Old and New GM had seen and known about for more than a decade:[22] "General Motors has decided that a defect which relates to motor vehicle safety exists in 2011-2013 model year (MY) Chevrolet Caprice and 2008-2009 Pontiac G8 vehicles.  There is a risk, under certain conditions, that some drivers may bump the ignition key with their knee and unintentionally move the key away from the 'run' position. . . . If this occurs, engine power, and power braking will be affected and power steering may be affected, increasing the risk of a crash. The timing of the key movement out of the 'run' position. . . may result in the airbags not deploying."[23]

96.    As will be shown at trial, all the foregoing knowledge of Old GM in all the preceding paragraphs was inherited by or is imputable to New GM within the meaning of the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in *Motors Liquidation Company, et al.*, *f/k/a General Motors Corp., et al.*, Case No. 09-50026 (REG).

---

[22] *See, e.g.*, Valukas Report at 57 n. 219 (emphasis added) ("GM employees were also having problems with their own MY 2004 Ions. A January 9, 2004 Report received from GM employee Gerald A. Young stated, 'The ignition switch is too low. **All other keys and the key fob hit on the driver's right knee**. The switch should be raised at least one inch toward the wiper stalk,' characterizing it as 'a basic design flaw that should be corrected if we want repeat sales.'  In a February 19, 2004 Report, GM employee Onassis Matthews stated: "The location of the ignition key was in the general location where my knee would rest (I am 6'3" tall, not many places to put my knee).  On several occasions, I inadvertently turn [sic] the ignition key off with my knee while driving down the road.  For a tall person, the location of the ignition key should be moved to a place that will not be inadvertently switched to the off position.'  Finally, in an April 15, 2004 Report, GM employee Raymond P. Smith reported experiencing a one-time inadvertent shut-off: 'I thought that my knee had inadvertently turned the key to the off position.'").

[23] Sept. 4, 2014, GM Part 573 Submission to NHTSA re: Recall No. 14V540, GM-MDL2543-301700168.

**V.**

**CLAIMS AGAINST GENERAL MOTORS, LLC BROUGHT BY PLAINTIFFS**

**COUNT I - Negligence, Gross Negligence, Recklessness**

97.    The Plaintiffs re-allege as if fully set forth, each and every allegation set forth herein.

98.    Under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement wherein New GM acquired certain Old GM assets, New GM assumed liability for crashes involving Old GM vehicles causing personal injury, loss of life or property damages. New GM also acquired knowledge of Old GM's activities with respect to the ISD via the mind of the employees, officers, managers, books and records obtained and/or acquired as a result of the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement and subsequent Sale Order. Thus, the duties of Old GM are part of the foundation for the liability assumed by New GM. Further, as identified herein, Plaintiffs have claims for stemming from a crash involving an Old GM vehicle that caused personal injury and property damage and New GM is therefore liable to the Plaintiffs.

99.    Old GM owed Plaintiffs a duty to design, manufacturer, fabricate, assemble, inspect, market, distribute, sell, and/or supply products in such a way as to avoid harm to persons using them such as the Plaintiffs.

100.    Old GM and New GM owed the Plaintiffs a duty to detect known safety defects in GM-brand vehicles.

101.    Old GM and New GM owed the Plaintiffs a duty, once they discovered the ignition switch defect, to provide thorough notice of the defect, including a warning that the defective vehicles should not be driven until an appropriate repair procedure is developed and performed.

102.    New GM owed the Plaintiffs a duty, once it discovered the ignition switch defect, to ensure that an appropriate repair procedure was developed and made available to drivers.

103.    Old GM and New GM breached the duties identified herein.

104.    Old GM's and New GM's breach of each of their duties identified herein directly and proximately caused Plaintiffs' injuries and damages.

105.    Old GM and New GM knew that customers, such as the Plaintiffs, expect that they will employ all reasonable efforts to detect safety defects and warn drivers of their existence.

106.    New GM's efforts to discover, provide notice of, and provide repair procedures for safety related defects exist for the benefit of the Plaintiffs and other drivers of GM-brand vehicles. New GM was aware that by providing maintenance and repair information and assistance, including through its authorized dealerships, New GM had a responsibility to the Plaintiffs and other drivers to take reasonable measures, including warning Plaintiffs of the safety defect and providing an adequate repair procedure.

107.    By reason of New GM's assumption of product liability under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement for crashes involving Old GM vehicles causing personal injury, loss of life or property damages, the failures of Old GM described above that contributed to or were causally connected to the injuries sustained by Plaintiffs were among the product liability of Old GM assumed by New GM.

108.    Independent of any failures by Old GM as described herein, New GM breached its duties to the Plaintiffs by failing to provide appropriate notice of and repair procedures for Plaintiff Seals' Defective Vehicle.  In doing so, New GM departed from the reasonable standard of care required of it.

109.     It was foreseeable that if Old GM did not provide appropriate notice of the defect, Plaintiff and others would be endangered. It was also foreseeable that if New GM did not provide appropriate notice and repair procedures for the Subject Vehicles, Plaintiff and others would be endangered.

110.     The Plaintiffs' injuries were reasonably foreseeable to Old GM and New GM.

111.     The Plaintiffs could not through the exercise of reasonable diligence have prevented the injuries caused by Old GM's and New GM's negligence, and gross negligence, and recklessness.

112.     Old GM's and New GM's acts and omissions, when viewed objectively from the actor's standpoint, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.  Old GM and New GM nevertheless proceeded with conscious indifference to the rights, safety and welfare of others.

113.     As will be shown at trial, all the foregoing knowledge of Old GM in all the preceding paragraphs was inherited by or is imputable to New GM within the meaning of the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in *Motors Liquidation Company, et al.*, *f/k/a General Motors Corp., et al.*, Case No. 09-50026 (REG).

**COUNT II - Fraud by Non-Disclosure**

114.     The Plaintiffs re-allege as if fully set forth, each and every allegation set forth herein.

115.     As set forth above, Old GM and New GM intentionally concealed or failed to disclose material facts related to the ignition switch defects from the Plaintiffs, the public, and NHTSA.  Indeed, Old GM and New GM failed to timely disclose serious and potentially life-

threatening defects in the Defective Vehicles within such time and in such manner as to prevent the Plaintiffs' injuries.

116.    As is also set forth above, New GM possessed independent knowledge of the defects in Plaintiff Seals' defective 1997 Chevrolet Malibu and other Old GM and New GM vehicles with the ignition switch defect and the need to undertake multiple design steps to resolve the defect condition to prevent injury and economic harm.  This knowledge was based, in part, on the information from records, files, reports and other documents and materials regarding the defective ignition switch maintained by Old GM, all of which were included in the assets purchased by New GM during the bankruptcy sale.

117.    New GM intentionally concealed or failed to disclose material facts related to the ignition switch defect from Plaintiffs, the public, and NHTSA.

118.    New GM had a duty to disclose the material facts to Plaintiffs, and New GM knew: (1) that Plaintiffs were ignorant of the material facts that New GM did not disclose and/or intentionally concealed; and (2) Plaintiffs did not have an equal opportunity to discover the material facts that New GM did not disclose and/or intentionally concealed.  New GM's fraud, fraudulent concealment and fraudulent non-disclosure were all components of the subject incident of the Plaintiffs.

119.    By failing to disclose these material facts, New GM intended to induce Plaintiffs to take some action or refrain from acting.

120.    Plaintiffs relied on New GM's non-disclosure, and Plaintiffs were injured as a result of acting without knowledge of the undisclosed facts.

121.    By reason of New GM's assumption of product liability under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement for crashes involving Old GM

vehicles causing personal injury, loss of life or property damage, the failures of Old GM described above that contributed to or were causally connected to the injuries sustained by Plaintiffs were among the product liabilities of Old GM assumed by New GM. Independent of any failures by Old GM as described herein, New GM breached its duties to the Plaintiffs by failing to disclose knowledge of the defects in the Defective Vehicles to the Plaintiffs.

## COUNT III - Strict Liability

122.    The Plaintiffs re-allege as if fully set forth, each and every allegation set forth in this Amended Complaint.

123.    Old GM and New GM, at all times relevant to this action, were engaged in the design, testing, manufacture, distribution, and sale of automobiles, including the Defective Vehicles.

124.    In particular, Old GM designed, tested, manufactured, distributed, and/or sold Plaintiff Seals' defective 1997 Chevrolet Malibu.

125.    Plaintiff's defective 1997 Chevrolet Malibu and other Old GM vehicles as well as New GM vehicles were defective due to the ignition switch defect at the time the vehicles were manufactured or sold by Old GM and New GM or when the vehicles left Old GM's and/or New GM's control.

126.    The Defective Vehicles were expected to and did reach users and consumers without substantial change in the condition in which said Vehicles were sold.

127.    As a result of the inherent ignition switch defect, Plaintiff Seals' defective 1997 Chevrolet Malibu and other Old GM and New GM vehicles with that defect were unreasonably dangerous, as defined by ordinary consumer expectations, to persons who use or might reasonably be expected to be affected by those vehicles.

128.    Plaintiff Seals' defective 1997 Chevrolet Malibu and other Old GM and New GM vehicles with the ignition switch defect were in a defective condition, creating risk of harm to users or consumers, including Plaintiffs.

129.    Plaintiffs were persons who used or could have reasonably been affected by the defective 1997 Chevrolet Malibu.

130.    The ignition switch defect set forth herein directly and proximately caused Plaintiffs' injuries.

131.    Under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement wherein New GM acquired certain Old GM assets, New GM assumed liability for crashes after the closing date of the Purchase Agreement involving Old GM vehicles causing personal injury, loss of life or property damage.  As identified therein, Plaintiffs have a claim for an April 2010 crash involving an Old GM vehicle that caused personal injury, loss of life or property damages and New GM is therefore liable to Plaintiffs.  New GM is also strictly liable to Plaintiffs for its failure to warn of the ignition switch defect in Plaintiff Seals' 1997 Chevrolet Malibu and its failure to inspect and retrofit the Subject Vehicle in order to remedy the defect.

132.    Plaintiffs' injuries and losses were directly and proximately caused by Old GM's designing, manufacturing, fabricating, assembling, inspecting, marketing, distributing, selling, and/or supplying Plaintiff Seals' 1997 Chevrolet Malibu in a defective condition for which New GM is strictly liable to Plaintiff pursuant to Restatement (Second) of Torts § 402A because that liability was assumed by New GM.

133.    Plaintiffs' injuries were directly and proximately caused by Old GM's designing, manufacturing, fabricating, assembling, inspecting, marketing, distributing, selling, and/or supplying the Subject 1997 Chevrolet Malibu without proper and adequate warnings, instructions,

and/or guidelines for safe use for which New GM is strictly liable to Plaintiffs because that liability was assumed by New GM.

134.    By reason of New GM's assumption of liability under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement for crashes after the closing date of the Purchase Agreement involving Old GM vehicles causing personal injury, loss of life or property damage, the failures of Old GM described above that contributed to or were causally connected to the injuries sustained by the Plaintiffs are among the liabilities of Old GM assumed by New GM.

## VI.
## DAMAGES

135.    Plaintiffs re-allege as if fully set forth, each and every allegation set forth herein.

136.    Plaintiffs pray for damages against the Defendant in a sum of money in excess of the jurisdictional amount of Seventy-Five Thousand Dollars ($75,000.00) plus costs and any such other relief to be deemed just and equitable to which they are entitled.

137.    Plaintiffs' bodily injuries were directly and proximately caused by Old GM's and Defendant New GM's conduct and omissions.  Accordingly, Plaintiffs are entitled to reasonable and proper compensation for the following legal and actual damages:

    a.  Past and future medical expenses;

    b.  Past and future pain and suffering;

    c.  Past and future disfigurement and loss of function;

    d.  Prospective medical care and medication costs;

    e.  Past lost wages and future lost wage-earning capacity; and

    f.  Property damage to her vehicle sustained in the crash.

## VII.
## PUNITIVE DAMAGES FOR INDEPENDENT CLAIMS BASED ON NEW GM'S KNOWLEDGE AND CONDUCT

138.    Plaintiffs re-allege as if fully set forth, each and every allegation set forth herein.

139.    Plaintiffs would further show that the clear and convincing evidence in this case will prove that New GM acted with reckless disregard of the health and safety of others in that when it knew or should have known that there was the extreme risk of danger vis-a-vis the use and operation of the Subject Vehicle and other Old GM and New GM vehicles with the ignition switch defect, all of which New GM had a duty to warn about and provide an adequate remedy therefor, but nevertheless proceeded with indifference to the rights, safety, or welfare of others, including Plaintiffs.  Therefore, Plaintiffs seek punitive damages against New GM.

140.    Plaintiffs would further show that New GM knew or ought to have known, in light of the surrounding circumstances, that New GM conduct would naturally and probably result in injury or damage and that New GM continued the conduct with malice or in reckless disregard of the consequences, from which malice may be inferred.

141.    Alternatively, Plaintiffs would further show that the clear and convincing evidence in this case will prove that New GM acted intentionally and with malice in that when it knew or should have known that there was the extreme risk of danger vis-a-vis the use and operation of the Subject Vehicle as well as other similarly defective Old GM and New GM vehicles with the ignition switch defect, all of which New GM had a duty to warn about and provide an adequate remedy therefor, but New GM nevertheless proceeded with indifference to the rights, safety, or welfare of others, including the Plaintiff.  Therefore, Plaintiffs seek punitive damages against New GM.

142.    Such misconduct was malicious, intentional, knowingly and/or grossly negligent, thereby justifying an award of punitive damages in an amount sufficient to punish Defendant for

its wrongdoing and to deter Defendant and others similarly situated from engaging in similar misconduct in the future.

143.    Plaintiffs would show that the amount to be awarded to them as punitive damages has a value well in excess of the minimum jurisdictional limits of the Court and in excess of that required for federal court jurisdiction in diversity of citizenship cases, for which exemplary damages they here and now sue.

## VIII.
## PRE-JUDGMENT INTEREST FOR PLAINTIFFS' DAMAGES

144.    Plaintiffs respectfully assert the request to be allowed to have the elements of damages considered separately and individually for the purpose of determining the sum of money that will fairly and reasonably compensate Plaintiffs for the injuries, death, losses, and damages incurred, and to be incurred, and that each element of Plaintiffs' respective damages be considered separately and individually, segregating the past and future losses, so that pre-judgment interest due Plaintiffs may be computed.

## IX.
## JURY DEMAND

145.    Plaintiffs requests a trial by jury.

## X.
## PRAYER

For the foregoing reasons, the Plaintiffs pray that the Defendant be cited to appear and answer herein, and that upon final hearing of the cause, judgment be entered for the Plaintiffs against Defendant for actual damages, as alleged, and exemplary damages, subject to proof and the limitations of the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in *Motors Liquidation Company, et al.*, *f/k/a General Motors*

*Corp., et al.*, Case No. 09-50026 (REG); together with pre-judgment interested (from the date of

injury through the date of judgment) at the maximum rate allowed by law; post-judgment interest

at the legal rate, costs of court; and such other and further relief to which Plaintiffs may be entitled

at law or in equity.


Dated: May 21, 2018                                  **BAILEY PEAVY BAILEY COWAN**
                                                     **HECKAMAN PLLC**


                                          By:   */s/ Robert Cowan*_____
                                                K. Camp Bailey
                                                Texas Bar No. 24006782
                                                Laurence G. Tien
                                                Texas Bar No. 24003057
                                                Robert W. Cowan
                                                Texas Bar No. 24031976
                                                Justin C. Jenson
                                                Texas Bar No. 24071095
                                                Marathon Oil Tower
                                                5555 San Felipe, Suite 900
                                                Houston, Texas 77056
                                                Telephone: (713) 425-7100
                                                Facsimile: (713) 425-7101
                                                bailey-svc@bpblaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document as served upon the attorney of record for each other party through the Court's electronic filing service on May 21, 2018, which will send notification of such filing to the e-mail addresses registered.


/s/*Robert Cowan*__

Robert Cowan